IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MIGUEL TORRES, *et al.*, | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 1:23-cv-212-ECM |
| | ) | [WO] |
| AIRBUS AMERICAS, INC., *et al.*, | ) | |
| | ) | |
|    Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

Now pending before the Court is a motion to remand filed by Plaintiffs Miguel Torres ("Mr. Torres"), Dalia Torres ("Ms. Torres"), Brent Przychoda ("Mr. Przychoda"), and Surisuda Przychoda ("Ms. Przychoda") (collectively "Plaintiffs"). (Doc. 36). On March 10, 2023, the Plaintiffs sued various defendants, including M1 Support Services, L.P. ("M1"), in the Circuit Court of Dale County, Alabama, for claims stemming from a helicopter crash. (Doc. 1-2 at 5–14).  Defendants Airbus Americas, Inc.; Airbus U.S. Space & Defense, Inc.; M1; BAE Systems, Inc.; BAE Systems Information and Electronic Systems Integration, Inc.; and BAE Systems Technology Solutions & Services, Inc. ("Removing Defendants") removed the case to this Court, asserting federal question jurisdiction and diversity jurisdiction. (Doc. 1).  The Removing Defendants argue this Court has federal question jurisdiction under the federal officer removal statute. *See* 28

U.S.C. § 1442(a)(1).[1]  They further argue there is diversity jurisdiction because the only non-diverse defendant is fraudulently joined. (Doc. 1 at 10); *see* 28 U.S.C. § 1332.

The Plaintiffs argue that neither federal question jurisdiction nor diversity jurisdiction exists in this case. (Doc. 36).  The motion to remand has been fully briefed and is ripe for review.  After careful consideration of the motion, briefs, and applicable law, the Court finds that there is federal question jurisdiction under the federal officer removal statute, and the motion to remand is due to be DENIED.

## II.  STANDARD OF REVIEW

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute." *Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 911 (11th Cir. 2014) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). A defendant may remove an action initially filed in state court to federal court if the action is one over which the federal court has original jurisdiction. 28 U.S.C. § 1441(a); *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  When jurisdiction turns on removal, "federal courts are directed to construe removal statutes strictly," and "all doubts about jurisdiction should be resolved in favor of remand to state court." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999).  "[T]he removing party bears the burden of demonstrating federal jurisdiction." *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 n.4 (11th Cir. 1998).

---

[1] The Removing Defendants also asserted federal enclave jurisdiction in their notice of removal, (doc. 1), but did not raise it in their opposition to the motion to remand, (doc. 43).

## III.  FACTS AND PROCEDURAL HISTORY

This matter arises from the crash of a United States Army UH-72A Lakota helicopter on April 20, 2021.  Mr. Torres served as pilot-in-command of the helicopter, while Mr. Przychoda served as co-pilot, when the helicopter allegedly "experienced an unplanned idling of both engines, entered into an uncontrollable descent, lost altitude, and crashed." (Doc. 1-2 at 6).  The Plaintiffs allege that M1 "designed, machined, inspected, maintained, serviced, modified, manufactured parts for, assembled, supplied, imported, distributed and/or sold the subject helicopter." (*Id.* at 7).  As a result of the crash, Mr. Torres and Mr. Przychoda are now paraplegic.

According to the Plaintiffs, a failure in the pilot seats exacerbated their injuries.  The pilot seats allegedly "failed to, among other things, attenuate and absorb the forces of the impact, as they were ostensibly designed and manufactured to do." (Doc. 1-2 at 8).  The Plaintiffs allege that M1, and/or BAE Systems, Inc., and/or BAE Systems Information and Electronic Systems Integration, Inc., and/or BAE Systems Technology Solutions & Services, Inc. "designed, manufactured, and/or maintained" the pilot seats. (*Id.*).

M1 is a private contractor with the U.S. Army providing aircraft maintenance services for Government Furnished Property. (Doc. 1 at 6, 8).  The Removing Defendants provided a Document Summary List with 176 documents detailing the regulatory scheme by which M1 must abide when performing maintenance services, including Army Regulation 750-1, Army Regulation 95-20, and United States Army Aviation Center of Excellence Regulation 95-59. (Doc. 43-3).  The Removing Defendants further assert that M1 is subject to DCMA Instruction 8210-1D, Contractor's Flight and Ground Operations.

3

This instruction is not found in the Document List; however, this instruction incorporates and cancels Army Regulation 95-20, which is found in the Document List.  M1 must also, according to Removing Defendants, comply with

> all government approved directives, Modification Work Orders (MW0s), Aircraft Engineering Bulletins, Service Bulletins, OEM Service Bulletins, Safety of Flight (SOF) messages, Aviation Safety Action Messages (ASAM), Technical Bulletins (TBs), Maintenance Information Messages (MIMs), Aviation Maintenance Action Messages (AMAMs), Airworthiness Releases (AWRs), All Army Activities (ALARACTs), Maintenance Engineering Call/Order (MEC/MEO), special onetime inspections, and Supplemental Type Certificates (STCs).

(Doc. 43-4 at 3).  The Removing Defendants contend that any act or omission by M1 regarding the helicopter, pilot seats, or both, would have been done pursuant to this plethora of regulations and their contract with the U.S. Army.[2]

Based on the crash and subsequent injuries, the Plaintiffs brought three causes of action against all Defendants: product liability, breach of warranties, and negligence.  The Removing Defendants removed the case, asserting this Court has federal question jurisdiction under federal enclave jurisdiction, or alternatively under the federal officer removal statute because M1 was acting under a federal officer in relation to the actions alleged against it.  The Removing Defendants further asserted there is diversity jurisdiction because the only non-diverse defendant was fraudulently joined.  In their motion to remand, the Plaintiffs argue that the Removing Defendants did not establish the necessary facts to show that the case arises within a federal enclave, that M1 does not meet the requirements for federal officer removal because they were not "acting under" a federal officer and there

---

[2] The Court is unable to locate M1's contract with the U.S. Army in the record.

4

was no causal connection, and that no defendants were fraudulently joined. The Court turns first to the federal officer removal statute.

## IV.  DISCUSSION

The Removing Defendants have asserted subject matter jurisdiction, arguing M1 meets the requirements of the federal officer removal statute. *See* 28 U.S.C. § 1442(a)(1). Section 1442(a)(1) permits removal of a civil action that is "against or directed to" "any officer (or any person acting under that officer) of the United States or of any agency thereof." *Id.* If the Removing Defendants are successful, then the entire case may remain in federal court. *See id.* (allowing for the removal of the entire "civil action").

The Removing Defendants contend that M1 was "acting under" the U.S. Army. Since M1 is not a federal officer or agency, it must satisfy a three-pronged test for federal officer removal to be proper. "First, [M1] must show that it is a person within the meaning of the statute who acted under a federal officer. Second, [M1] must show that it performed the actions for which it is being sued under color of federal office." *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (citations omitted). In other words, M1 must show "a causal connection between what the officer has done under asserted official authority and the action against him." *Id.* (quoting *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996)). Finally, M1 "must raise a colorable federal defense." *Id.*

The Plaintiffs concede that M1 is a person within the meaning of the statute. (Doc. 36-1 at 7). The Plaintiffs further concede that "Removing Defendants have a colorable federal defense to Plaintiffs' claims through their asserted government contractor defense."

5

(*Id.*).  The Plaintiffs dispute that M1 was "acting under" a federal officer and that there was a "causal connection" between what M1 has done under the asserted authority of the U.S. Army and the Plaintiffs' claims against M1.

A.     **"Acting Under"**

The parties dispute whether there was the requisite level of "subjection, guidance, or control" by the U.S. Army to find that M1 was "acting under" a federal officer. *See Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151 (2007).  The "words 'acting under' are broad, and [the Supreme] Court has made clear that the [federal officer removal] statute must be 'liberally construed.'" *Id.* at 147.

In *Watson*, the Supreme Court held that a private cigarette manufacturer was not entitled to federal officer removal because simply complying with federal regulations or law is insufficient to establish that a party was "acting under" a federal officer. *Id.* at 157. The Supreme Court explained that the relationship between a private person acting under a federal officer "typically involves subjection, guidance, or control," and thus merely operating in a heavily regulated field is not enough to demonstrate that the private person was "acting under" a federal officer. *Id.* at 151.

Although *Watson* involved a private company, not private contractors, the Court did discuss why private contractors differ from private companies who operate in a heavily regulated field. *See id.* at 154 ("And we need not further examine here (a case where private contracting is not at issue) whether and when particular circumstances may enable private contractors to invoke the statute."). The Court wrote favorably of lower courts that "have held that Government contractors fall within the terms of the federal officer removal

6

statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Id.* at 153; *see also Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998); *Agyin v. Razmzan*, 986 F.3d 168, 176–77 (2d Cir. 2021) ("Cases in which the Supreme Court has approved removal involve defendants working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government.").

The Supreme Court further explained that the difference lies in the fact that the "assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153. In other words, the "private contractor in such cases is helping the Government to produce an item that it needs." *Id.* The Court discussed the Fifth Circuit's decision in *Winters* to illustrate this point, explaining that Dow Chemical's production of Agent Orange "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform," thereby helping the government to conduct a war. *Id.* at 154 (citing *Winters*, 149 F.3d 387).

Based on this Court's own research and the parties' briefs, the Eleventh Circuit appears to have issued one reported decision concerning the federal officer removal statute, and while the case also did not directly involve private contractors, the reasoning of the case is still relevant. *See Caver*, 845 F.3d 1135. In *Caver*, Central Alabama Electric Cooperative ("CAEC"), a rural electric cooperative, removed a case to federal court under the federal officer removal statute. 845 F.3d at 1138. The Eleventh Circuit held that CAEC was "acting under" a federal officer for two reasons. *Id.* at 1142–44. First, federal

7

regulations demonstrated a "close and extensive relationship between CAEC and [United States Department of Agriculture Rural Utilities Services ("RUS")], as well as RUS's significant level of control over CAEC's operations." *Id.* at 1144. The Eleventh Circuit looked to the portion of the loan agreement between CAEC and RUS, including the limitation on distributions in the agreement, and the model loan agreement in the federal regulations. *Id.* at 1139–41. This was sufficient to show that "rural cooperatives, such as CAEC, are highly regulated by the federal government." *Id.* at 1143. Second, CAEC assisted RUS by "performing a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 1144 (quoting *Watson*, 551 U.S. at 154). Specifically, CAEC brought "electricity to rural areas that would otherwise go unserved." *Id.*

For these reasons, the Eleventh Circuit stated that CAEC was "closer in kind to a federal contractor performing work on behalf of the government than a private business working for its own ends." *Id.* The Eleventh Circuit cited two cases to support that statement: *Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012), and *Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010). In *Ruppel*, the Seventh Circuit explained that "'[a]cting under' covers situations . . . where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." 701 F.3d at 1181. In *Bennett*, a mold company, MIS, contracted with the government to remove mold. The Sixth Circuit held that the company "acted under" a federal officer because the company's assistance

8

> went beyond "simple compliance with the law" . . . MIS helped FAA officers carry out their task of ridding a federal employee occupied building of an allegedly hazardous contaminant—"a job that, in the absence of a contract with [MIS] [or another private mold remediation firm] the [FAA] itself would have had to perform."

*Bennett*, 607 F.3d at 1088 (alterations in original) (quoting *Watson*, 551 U.S. at 154).

Here, the Removing Defendants must show both that there is an "unusually close" relationship between M1 and the U.S. Army involving "detailed regulation, monitoring, or supervision," and also that M1 performs a task the government otherwise would have had to perform absent a contract. *Watson*, 551 U.S. at 153; *see also Caver*, 845 F.3d at 1142–44; *Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021) ("[A] private contractor may 'act under' a federal officer when the relationship 'is an unusually close one involving detailed regulation, monitoring, or supervision.'") (quoting *Watson*, 551 U.S. at 153); *W. Va. State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288, 299 n.8 (4th Cir. 2022) ("Our sister circuits have also found that when a private corporation works closely with the federal government by contract, to provide a service or product, then there is a sufficient nexus to find that the private actor is 'acting under' federal 'subjection, guidance, or control.'").

1. *There is sufficient "detailed regulation, monitoring, or supervision" of M1.*

The parties, in their briefs, do not use the language "detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. Rather, they focus on whether there is sufficient control by the U.S. Army over M1, pulling that requirement from the Supreme Court's explanation that the relationship "of a private person 'acting under' a federal 'officer' or 'agency' . . . typically involves 'subjection, guidance, or control.'" *Watson*, 551 U.S. at

9

151. However, the Supreme Court cited with approval lower courts which found that private contractors "fall within the terms of the federal officer removal statute," when the "relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Id.* at 153. Since M1 is a private contractor, the Court will focus on whether there is an "unusually close" relationship "involving detailed regulation, monitoring, or supervision," but will use language such as "subjection, guidance, or control" when the parties have used that language. *Id.* at 151, 153.

The Plaintiffs argue that the relationship between M1 and the U.S. Army is not sufficient for removal because M1 merely exists within a highly regulated industry and the U.S. Army does not direct the acts or omissions of M1. (Docs. 36-1 at 7–8, 44 at 6). As previously discussed, the Supreme Court stated that there must be more than mere "compliance (or noncompliance) with federal laws, rules, and regulations" for a private actor to be "acting under" a federal officer. *Watson*, 551 U.S. at 153. According to the Plaintiffs, because "the control rests with the [original equipment manufacturers ("OEM")], not any federal officer," then M1 and the Removing Defendants "collectively operate under the 'subjection, guidance, and control' of *themselves*."[3] (Doc. 44 at 6–7) (emphasis in original).

The Removing Defendants argue that the relationship between M1 and the U.S. Army is sufficiently close and involves "detailed regulation, monitoring, or supervision"

---

[3] The Supreme Court stated that the relationship between the federal officer and the person "acting under" them typically involves "subjection, guidance, *or* control." *Watson*, 551 U.S. at 151 (emphasis added).

because M1 is subject to a comprehensive regulatory scheme that dictates M1's services and from which M1 cannot deviate. *See Watson*, 551 U.S. at 153. In support, the Removing Defendants provided a Document Summary List and a Declaration from Allan H. Lanceta ("Lanceta"), Vice President and General Manager of M1. Lanceta explains that the regulations, directives, technical orders, and manuals detailed in the Document List "dictate and control" M1's work as "part of M1's contract with the United States Government." (Doc. 43-4 at 3). M1 must also comply with

> all government approved directives, Modification Work Orders (MW0s), Aircraft Engineering Bulletins, Service Bulletins, OEM Service Bulletins, Safety of Flight (SOF) messages, Aviation Safety Action Messages (ASAM), Technical Bulletins (TBs), Maintenance Information Messages (MIMs), Aviation Maintenance Action Messages (AMAMs), Airworthiness Releases (AWRs), All Army Activities (ALARACTs), Maintenance Engineering Call/Order (MEC/MEO), special onetime inspections, and Supplemental Type Certificates (STCs).

(*Id.*). Further, "[a]ll aircraft maintenance, training, safety, and quality control performed by M1 is directed by the US Army to be strictly performed in accordance with Army Regulation 95-20 and U.S. Army Aviation Center of Excellence Regulation 95-59." (*Id.* at 3–4). M1 "cannot depart from the U.S. Army's detailed specifications and procedures for aircraft maintenance." (*Id.* at 4).

Additionally, Lanceta explains that "M1's work is subject to surveillance as well as both scheduled and unscheduled inspections by officers of the United States Government," and "the United States Government has final acceptance authority for aircraft maintenance performed by M1." (Doc. 43-4 at 4). Section 4-19 of Army Regulation 750-1 provides that "the ACOMs, ASCCs, and DRUs will ensure that essential quality requirements for

11

maintenance service contracts are defined, quantified, measured, and assessed during the contracted-out support process." DEP'T OF THE ARMY, ARMY REGULATION 750-1, MAINTENANCE OF SUPPLIES AND EQUIPMENT: ARMY MATERIAL MAINTENANCE POLICY (Mar. 2, 2023), https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN32929-AR_750-1-000-WEB-1.pdf.  For reference, ACOM stands for army commands, ASCCs stands for army service component commands, and DRUs stands for direct reporting units. *Id.*  This evidence shows that the U.S. Army monitors and supervises the contracts of maintenance service, and M1 has a maintenance service contract; thus, there is an "unusually close" relationship involving detailed supervision between M1 and the U.S. Army.

Considering this extensive regulatory scheme, the Plaintiffs' argument that "M1 simply performs tasks based on manuals and standards promulgated by the OEM of the air craft" fails. (Doc. 44 at 7).  Although the Removing Defendants concede that the "Government directed M1 to perform all OEM specific maintenance . . . in order to maintain the level of airworthiness required to maintain FAA airworthiness certification," (doc. 43 at 15), as demonstrated, the OEM specified maintenance is in "addition[] [to] the U.S. Army mandated directives regarding M1's maintenance performance," (doc. 43-4 at 4).

The Plaintiffs' argument that the Removing Defendants "collectively operate under the 'subjection, guidance, and control' of *themselves*" similarly fails. (Doc. 44 at 6) (emphasis in original).  As evidence that the Removing Defendants control themselves, the

Plaintiffs point to "Defense Contract Management Agency Policy,"[4] Section 3.2, which states that the "contractor is responsible for writing, implementing and enforcing its Procedures, and identifying and correcting deficiencies." (Doc. 44 at 5). However, Section 3.1, which the Plaintiffs do not mention, states that the Procedures must be approved by a GFR, which is a "current or previously rated U.S. Military officer or previously rated Government civilian to whom the Approving Authority has delegated responsibility for approval of contractor flights, Procedures, crewmembers, and ensuring contractor compliance with applicable provisions of this Instruction Correspondence Guide." DEF. CONT. MGMT. AGENCY, DCMA INSTRUCTION 8210-1D, CONTRACTOR'S FLIGHT AND GROUND OPERATIONS (Feb. 6, 2023), https://www.dcma.mil/Portals/31/Documents/Aircraft%20Operations/INST_8210-1D_(Rewrite)_(20230206).pdf ("Conducting aircraft operations prior to GFR written approval of the Procedures for those specific aircraft operations may constitute a contractual non-compliance."). Thus, while M1 has some discretion over creating their Procedures, the Procedures are still subject to the U.S. Army's control because they must be approved by military personnel. *See Caver*, 845 F.3d at 1139 (explaining that the loan agreement and regulation allowed RUS "to approve plans and specifications for

---

[4] The Plaintiffs call the document "Defense Contract Management Agency Policy," but this moniker is inaccurate. (Doc. 44 at 5). The Removing Defendants stated that "M1's work was governed by a comprehensive scheme that comprised, among many others . . . Defense Contract Management Agency policy." (Doc. 43 at 14). They then cited, under "*see, e.g.*," DCMA Instruction 8210-1D Contractor's Flight and Ground Operations. Because the Court is analyzing the Plaintiffs' argument, the Court decided to use the Plaintiffs' name for the document.

13

construction"). In this case, M1's authority to create procedures or plans that are ultimately subject to federal approval does not, by itself, negate federal control.

Based on the examined regulations, the extensive Document List, and Lanceta's statements in his declaration, the Removing Defendants have sufficiently demonstrated that M1 is highly regulated, controlled, and supervised by the U.S. Army. Like the situation in *Caver*, this level of regulation "demonstrate[s] the close and extensive relationship between" M1 and the U.S. Army. *See Caver*, 845 F.3d at 1143. On this record, the relationship between M1 and the U.S. Army is "unusually close" and involves "detailed regulation, monitoring, or supervision" sufficient for federal officer removal. *See Watson*, 551 U.S. at 153.

> *2. M1 performs a government task that, in the absence of a contract, the government would have to perform.*

The Court now turns to the argument that M1 performs a basic government task that the government otherwise would have had to perform absent a contract. The task M1 performs is aircraft maintenance of "Government Furnished Property" for the U.S. Army pursuant to a contract. (Doc. 1 at 6). The Removing Defendants allege that "under M1's Aviation Maintenance Contract, the Government specifically reserves the right to use its own employees to perform any facet of the contract." (*Id.*). Thus, according to the Removing Defendants, M1 performs the task of aircraft maintenance that the government itself would perform in the absence of a contract with a private firm. The Plaintiffs, in turn, argue that "there is no showing that the U.S. Army would (or could) perform maintenance

14

services but for the existence and help of Defendant M1" because the OEMs could "easily" provide the required maintenance. (Doc. 44 at 6–7).

The Plaintiffs argument fails for multiple reasons. First, the Plaintiffs provide no evidentiary support for their assertion that the OEMs could provide the required maintenance. Thus, the Plaintiffs' unsupported assertions are insufficient to show that M1 did not perform a task for the U.S. Army or that the government would not perform the task in the absence of a contract.

Second, even if the OEMs could provide the required maintenance, that fact does not undermine the conclusion that M1 assists the government in a task it would otherwise have to perform. The test for whether an entity provides a service to the government rests on whether, "in the absence of a contract with a private firm," the government would be required to perform the task. *Watson*, 551 U.S. at 154. When the Supreme Court provided an example of a private contractor who acted under federal authority, the Court stated that "Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154. The Court did not say, "in the absence of a contract with Dow." The Court's choice of language suggests that the assistance prong is met if the task is one the government would have to perform in the absence of a contract with *any* private entity—not just the private entity involved in the litigation. Furthermore, in *Bennett*, the Sixth Circuit held that, "MIS helped FAA officers carry out their task of ridding a federal employee occupied building of an allegedly hazardous contaminant—'a job that, in the absence of a contract with [MIS] [*or another private mold remediation firm*] the [FAA] itself would have had to perform.'" 607 F.3d at

15

1088 (alterations in original) (emphasis added) (quoting *Watson*, 551 U.S. at 154).  The Sixth Circuit appears to agree with the interpretation that the government does not have to be the next entity to perform the task, and the Eleventh Circuit cited this case favorably in *Caver*.  The Court finds *Bennett*'s analysis persuasive.

Finally, M1 contracts with the government to provide aircraft maintenance services of aircraft "owned and provided under M1's contract with the Army as Government Furnished Property." (Doc. 1 at 6).  It stands to reason that in the absence of a contract with M1, or any private contractor, the U.S. Army would be required and able to provide maintenance of their own property.

Thus, M1 performs a service for the government—aircraft maintenance—that the government otherwise would have had to perform.

Accordingly, the Removing Defendants have shown that M1 is "acting under" the federal authority of the U.S. Army.  M1 has an "unusually close" relationship "involving detailed regulation, monitoring, or supervision," as demonstrated through the examined regulations, the Document List, and Lanceta's declaration.  M1 also performs the task of aircraft maintenance that the government otherwise would have had to perform absent a contract with M1 or another private firm.

**B.    "Causal Connection"**

To satisfy the second prong of the Eleventh Circuit's test, the Removing Defendants must show that there is a "causal connection between [Plaintiffs'] claims and an act of Defendant [M1] that forms the basis of those claims." *Caver*, 845 F.3d at 1144.  For a claim to be removable, it must be "for or relating to any act under color of federal office." *Id.* at

16

1142 (quoting 28 U.S.C. § 1442(a)(1)).  The Eleventh Circuit explained that the "phrase 'relating to' is broad and requires only a connection or association between the act in question and the federal office." *Caver*, 845 F.3d at 1144 (citations omitted).  Essentially, the private actor must show a "'causal connection' between the charged conduct and asserted official authority." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham v. Morgan*, 395 U.S. 402, 409 (1969)).  Thus, "the hurdle erected by this requirement is quite low." *Caver*, 845 F.3d at 1144 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)).

The Plaintiffs argue that the "Removing Defendants have also failed to show any nexus between the Plaintiffs' claims and any act or inaction forming the basis of such claims." (Doc. 36-1 at 10).  The Plaintiffs make two claims against M1 in their Complaint: (1) that "[a]t all relevant times herein, Defendant M1 Support Services designed, machined, inspected, maintained, serviced, modified, manufactured parts for, assembled, supplied, imported, distributed and/or sold the subject helicopter, a UH-72A Lakota, in the course of business," (doc. 1-2 at 7); and (2) that M1 "designed, manufactured, and/or maintained" the pilot seats, (*id.* at 8).  The Plaintiffs allege in their Complaint that the subject helicopter was the reason for the crash and that the failure of the pilot seats exacerbated their injuries.

Based on the Plaintiffs' Complaint, M1's alleged actions or inactions on the subject helicopter, the pilot seats, or both, which were performed while M1 was "acting under" the U.S. Army, form the basis of the Plaintiffs' claims against M1.  Thus, the Court concludes that the Removing Defendants have successfully cleared the low hurdle of demonstrating

17

a "causal connection" between the Plaintiffs' claims and M1's alleged conduct. *See Caver*, 845 F.3d at 1144.

## V.  CONCLUSION

M1 "acted under" a federal officer or agency—the U.S. Army—and there is a "causal connection" between what M1 has allegedly done under the asserted authority of the U.S. Army and the Plaintiffs' claims against M1.  Therefore, this Court finds that it can exercise federal question jurisdiction pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Because the Court concludes it has jurisdiction under the federal officer removal statute, it does not address the Removing Defendant's diversity jurisdiction argument.  Additionally, because the Removing Defendants did not present any argument regarding federal enclave jurisdiction in their response to the Plaintiffs' motion to remand, the court declines to address federal enclave jurisdiction.

Accordingly, for the reasons stated, and for good cause, it is

ORDERED that the Plaintiffs' motion to remand (doc. 36) is DENIED.

DONE this 1st day of February, 2024.

                                            /s/ Emily C. Marks
                                         EMILY C. MARKS
                                         CHIEF UNITED STATES DISTRICT JUDGE